The Fourth Division, the Honorable Justice Shelvin Louise Marie Hall presiding, case number 1-9-1762, Rocio Montes versus Jose Guadalupe Ignacio Yulo-Toscano. Thank you all for being here this morning. Welcome to the Fourth Division. The first counseling appellant, please introduce yourselves, and both of you should introduce yourselves. And the first speaker should let me know how much time you'd like reserved out of your 15 minutes for a rebuttal. Please proceed. Thank you, Your Honor. Thank you, Your Honor. Evan Whitfield, Shorter Canton Fleck. I'm here on behalf of the appellant respondent, Jose Toscano. He was supposed to be on, but he may be having technical difficulties. My former law clerk, current associate hire, Christina Perez, is on with us, just observing, Your Honor. I would like to reserve three minutes for the rebuttal. Judge, Jack Coladarchi from Coladarchi and Coladarchi for the appellee, Rocio Montes. My partner and sister, Anne, is observing. And in terms of any extra time, I wouldn't need more than three minutes, Judge. You have to do yours all in 15 minutes. You don't have a rebuttal. I'm sorry. Can you hear me? Yes. Appellant? Yes, Your Honor. Please proceed with your argument. I'm sorry, Your Honor. May it please the court. Good morning, justices. Again, my name is Evan Whitfield. I'm a partner at Shorter Canton Fleck, and I'm here on behalf of the appellant respondent, Mr. Toscano. I want to convey to the justices that while I'll be focusing on the technical aspects of this case, both Jose and I are aware of the human element and the serious nature of the abuse allegation. We do not want the arguments which focus on the technicalities of the convention to be misconstrued as callousness to the emotional toll that this family has had to endure. At the trial court level, Jose met his burdens through a motion for judgment on the pleadings. The court granted that motion and found the child's habitual residence was in fact Mexico, and that Jose was exercising his custodial rights at the time of the child's removal to the United States. Thereafter, the burden shifted to Rocio, the appellee, to prove her three affirmative defenses. She pled Article 12, 20, and 13B affirmative defenses. After presenting her case in chief, Jose moved for a directed finding, and the court granted that directed finding as to the Article 12 defense and the Article 20 defense. The case then proceeded on the sole issue of Rocio's grave risk affirmative defense pursuant to 13B. At the close of evidence, the court published a memorandum and opinion in order, and found that by clear and convincing evidence that there is a grave risk that the return of a minor child would expose the child to physical or psychological harm, or otherwise place the child in an intolerable situation. The appellate and the appellee agree that the sole issue presented here for review today is whether the trial court erred in concluding that the two disputed allegations of abuse were sufficient to meet the threshold to establish that a grave risk the child existed to prevent the repatriation to the home jurisdiction of Mexico. Before getting into the facts, it helps to understand the history and purpose of the Hague Convention. The Northern District of Illinois, in a case called Haberzeik, speaks concisely to the purpose of the convention. It states that the convention is an international multilateral treaty that was adopted in 1980. The purpose of the convention is to address the problem of international child abductions that typically occur in domestic relations settings. The to respond to the scenario in which one person, typically a parent, removes a child to or restrains a child in a country that is not the child's habitual residence in order to obtain custody rights from the authorities of that country for which the child's been taken. The convention aims to ensure that the right to custody and access to a child under the law of the home state are respected in the post-removal state by securing the prompt return of the child who was wrongfully removed to or retained in a contracting state. A court's application of the convention is only to the merits of the abduction claim. Anything related to the underlying custody dispute is to be ignored as the contracting states of the convention respect the respective court systems and all believe that those home relations in the best interest of the child. Because the convention is meant to reestablish the pre-removal status quo, the court must construe any defense offered narrowly. And even if a defense applies, the court pursuant to the convention has the discretion to send a child back to the home jurisdiction if in fact that furthers the purpose of the convention. The main error in the trial court's ruling in this matter is that it failed to construe the grave risk defense narrowly and demand the requisite proof, burden of proof, of clear and convincing evidence to establish a great risk for one second. But does the convention itself define what is grave risk? It says grave, no, plainly no, your honor. It says grave risk or intolerable situation. I will speak to that in one moment. The underlying body of case law is where you see a continuum of what has constituted grave risk and what has not met that burden. Okay. And then also the convention, if I'm correct, doesn't it also provide a provision for safe return that the court must look at whether you're going to return a child or the The interest of the child is paramount, your honor. So of course, yes. I will speak to that safe return when I get to the facts of the case. Okay. Thank you. The main error in the trial court's ruling in this matter is that it failed to construe the grave risk defense narrowly and demand the requisite burden of proof of clear and convincing evidence. By agreeing with Rosio's overly broad interpretation of the grave risk defense, the trial court frustrated the paramount purpose of the convention, which is to one, preserve the status quo, and two, to deter parents from crossing borders to seek more sympathetic courts. Speaking specifically to the 13B grave risk defense, it reads, the requested state is not bound to order the return of the child if the person which opposes the return establishes that there is a grave risk, that his or her return would expose the child, not expose the litigant, expose the child to physical or psychological harm, or otherwise place the minor child in an intolerable situation. To your question, Justice Reyes. The convention strikes a balance between the inherent tension between the purpose of the law, again, preserving the pre-removal status quo and deterring abductions, against the welfare of the child. Tell me, where was the grave risk to the child here? I understand that there was a threat to the mother while she was holding the child, and I understand that that's transferable and considered a threat to the child as well, but were there any other instances of threats, either physical or emotional, to the child in this case, other than that one incident? Your Honor is correct. The evidence presented by Rocio lacked any allegations to direct harm, physical or emotional, to the child. Mr. Toscano testified, and it was agreed by both parties' testimony, that the child was never abused verbally or included a singular instance of verbal abuse, alleged, that was disputed, that was on January 2016. It was at a festival. The second isolated instance of abuse was physical in nature, occurred on either March or April of 2017, and that was at the home. That instance of abuse was also disputed in that my client, Mr. Toscano, denied choking or grabbing Ms. Montes. Ms. Montes testified that he did, in fact, choke her and grab her by the neck. Interestingly, when you look at the record, her initial petition for custody, child support, and name change that she filed upon coming to Cook County was different than what she testified ultimately at trial. It said that the child was trying to be let out, non-specifically, and that he attempted to grab her. After Jose filed his petition for return pursuant to Haig, Ms. Montes' answer became more specific and said, no, he, in fact, did grab me and choke me by the neck, and I was holding my child, which was an evolution of the allegations. Then again, finally, at testimony, that resuscitation of that event became even more specific. To answer your question more concisely, the entirety of the universe are two instances of abuse. Counsel, can I ask a question regarding the presentation of the evidence? The appellee in their brief, not only with regards to the 13B defense, but as to the other issues that were raised under the convention, it indicated that they were not allowed an opportunity to adequately present evidence. Can you speak to that, that the court kept on sustaining objections and they weren't allowed to present evidence that they wanted to present during the hearing? Correct, Your Honor. As I mentioned earlier, one of the purposes of the convention is to respect the contracting state's authority in their home jurisdictions. All of the signatories, by notice, are presumed to be able to deal with the underlying domestic relations issue, in this case, custody. The convention is not allowed to take any evidence as to who is a better parent, where the child may be more happy, or any of that. All of the objections that I put forth at the trial court level were based on relevance connected to the singular narrow issue of establishing the home jurisdiction, number one, establishing whether or not the movement was exercising custodial rights, which he was. Then, after that, whatever affirmative offenses that would have been alleged, in this case, the 13B. Again, the court sustained those objections correctly in the sense that this is a very singular, narrowly construed issue. The information that the appellee was attempting to get in was all having to do with the underlying custody dispute that should be litigated in Mexico. There was nothing preventing them from bringing expert witnesses, or testimony, or running the case how they saw fit. I counsel, in terms of intolerable circumstances where the child would go, it seems like all of the objections also, well, not all of them, but many of them went to what she was trying to show in terms of the alleged abuse that she was afraid that would occur to the child. When she tried to put those things in, you objected to them. She tried to put in that he didn't take care of the child to go back to a situation where there was nothing. None of that kind of information came in. You say it's not relevant, but how could it not be relevant to the intolerable circumstances that the child may have been placed in if she went back to the home? I remember questions about, did he work? Did he have a place to live? Who's going to take care of the child? The judge would not allow any of that to go in. It seems to me that that impacts the grave risk as it relates to intolerance. Are any of the other justices having trouble hearing Justice Lamkin? Your last sentence, talking about the judge, it cut off, but the judge would not allow. I'm sorry. My internet is unstable. There are 278 apartments in my building. I was saying it seems to me that many of the questions that were asked did go to intolerable circumstances that the child may have been put in if she were sent back and spoke to the issue of grave risk. You keep saying that her statements were contested, but the judge made it credible via assessment. The judge said he believed her and he didn't believe your client. Isn't he, or she, I'm sorry, I think it's a female judge who did this. Isn't she entitled to make those determinations to say, yes, he choked her. Yes, she was holding the baby. Yes, he threatened to kill her if she took the child away. Let's see. I'm trying to remember. There were more things than that, but there were, and she tried to put in that there was a course of conduct of abuse and the judge wouldn't let her put those in. And I don't understand how those would not have been relevant. So you can look to anything that I just said. I think you've asked three questions, your honor. And I think I'll take the last one first. The testimony. And you'll have to wrap up after that because your time has expired. Okay. I understand. So I'll answer it this way. The grave defense risk is used in two situations where the returning child, where when returning the child means sending them to a war zone, famine, or disease, or second, in the case of abuse or neglect, or in the case of extraordinary emotional dependence. All of the objections that were rightly sustained go to the underlying custody dispute that the home jurisdiction is supposed to deal with. That is the purpose of the convention, comedy between the jurisdictions. The testimony that was not allowed regarding what Mr. Toscano does for a living and X, Y, and Z is inconsequential to the convention. It has everything to do with what will be determined in the home jurisdiction when the parties avail themselves to that jurisdiction, which is what the, which is supposed to happen because there was a wrongful removal supposed to go back. We are not asking, and this is important. We are not asking. And Jose was never asking that child be transferred with possession from mother to father. That was not the intention. That's not what's going on here. It's simply that the child returned to the home jurisdiction so that the underlying, so the Mexican court can make those custody determinations. It very well say that Jose did all of these things and is not fit and that mother should have the child. That is not for these courts to determine. And again, the fact, the individual characteristics of the litigants are important because everything that got in regarding the safety of the child and whether or not that situation would be intolerable got in. Ms. Montes testified that she's a dual national citizen with Mexico and the United States. She has family in both Mexico, the city of Jalisco, Guadalajara in Mexico and Chicago. Her family owns property in both locations. She was employable and in fact was employed in both locations. She testified to a fluidity of ability to move back and forth between the two countries. She is not dependent emotionally, physically, for a boat, housing, food in any regard to Mr. Toscano. All the court was required to do is make the two findings that it made and then see if return repatriating that child would be a intolerable situation or a grave risk to the child. Ms. Montes is capable of bringing that child to Mexico on a temporary basis, multiple times to deal with the underlying custody dispute. So I think, I hope that answers and that's what Judge True was relying on when she kept the testimony so narrow. We all knew based on Ms. Montes' own pleadings and her own testimony that she had places to be and stay and be cared for and to deal with her, their daughter in Mexico and in the United States. And the last thing I'll say. Any other questions? Any other questions, Justice Reyes? So following up with Justice Lampkin's question, I mean it also, the FPLE is arguing that even when they were trying to address the issue of domestic violence or the lack of domestic violence, that they weren't allowed the opportunity to present that evidence because of the objections that were sustained and therefore they weren't able to present their entire case. Quickly to that, Your Honor. Yes, Your Honor. Again, the rules of evidence are not aspirational. They are required and they go and we have rules of evidence to test the credibility and for the court to weigh the credibility. When she was attempting to go beyond the four corners of her two allegations within the pleadings, objections were made based on foundation and they were sustained when appropriate. I did not win every objection. Plenty of evidence got in. If she alleged something on the stand that was not in any of her pleadings and there were no witnesses and no corroborating evidence, whether physical or expert or otherwise, those objections were sustained for lack of foundation. It wasn't, which again, it ensures the integrity of the testimony so that only the most credible and most, the veracity can be actually weighed by the trier fact, which has in fact occurred. The last thing I will say just to wrap this up, Your Honor, is that the trial court's ruling that two incidences of alleged abuse against the mother that the child may or may not have witnessed and no physical abuse ever alleged against the child is in error and affirming the trial court's ruling would destroy the purpose of the convention, which is to deter abductions and respect the removal status quo. Expanding the exception to this degree with this dearth of evidence would eviscerate the convention and it would be the exception that swallowed the rule. Thank you, Your Honors. Thank you. My colleagues, any other questions? Justice Lamkin? No, thank you. Justice Reyes? No, thank you. Okay, thank you. We'll move on to the appellee, Mr. Coladarchi. Thank you, Judge. Your Honor, one of the main issues... Just a moment, Mr. Coladarchi. Sure. So, two, one, four, two, six, and two. Our math is a little slow here. You'll have 23 minutes if you need it. We're adding on for the amount of additional time. Thank you, Judge. The council's description of how the convention is supposed to work is a very narrow construction of the convention. It isn't just a venue statute where we say whether or not we need to determine whether or not the first step, which Judge True found did apply, applies and then go to grave risk. Grave risk is a very narrow form of best interest, and there isn't a risk of the grave risk analysis swallowing the entire rule. The grave risk analysis, it's a very high standard, clear and convincing. Judge True knew that. But each one of the subsidiary facts can be proved on a preponderance of the evidence. I think one of the cases says if you have 20 facts that the judge is considering to determine clear and convincing evidence, they can make that determination if they find that each one of those facts was only by a preponderance of the evidence. I'm going back to the question of evidence that council raises. The convention itself has specifically stated that evidence rules are somewhat relaxed in terms of the evidence that's let in. This is a matter of allowing in evidence in terms of time. Sometimes these cases are done very quickly, and they want to try to get as much evidence before the court as possible. Reliable evidence, but still provisions of the treaty remove a lot of the formality of evidence. That's why we have affidavits from members of Rocio's family. Those affidavits, they described the relationship between Rocio and Jose as contentious, and they were always fighting. That was the testimony. It wasn't just three incidents. There was a pattern of behavior by Jose towards Rocio, whether or not the minor child was with being a strategy of coercive control. What Judge True was looking at was looking at the entirety of the relationship between Jose and Rocio. If she says in her opinion, she said, I had a lot of opportunity to observe everyone who testified and came to the conclusion that Jose was credible. During this hearing, I think there were either six or four trial dates in which Jose was present and was in a computer screen looking back at Judge True. She was able to observe him and to observe his reactions and make an assessment of his credibility. In terms of the evidence that we were trying to get in, we were trying to get evidence in of a to some extent about behavior that made my client not want to leave the child with Jose. The other side objected. We had a little bit of discussion on that point. Then the judge, he objected again. Then they said, okay, we're going to stop that examination of that evidence. In terms of the evidence where we were trying to get in, evidence of his job, where he worked, who he lived with, did he make any money? Was he even employed? We have no idea about anything about where, anything about Jose because they objected to that. I think the judge was probably trying to avoid creating anything that looked like an argument on the best interest of the child. What we were trying to do is number one, look at the credibility of the witness to see whether or not he was telling the truth and whether he was credible. Then also to look at the idea of undertakings. Undertakings is one of the things that Evan referred to it earlier. It's one of the things the court would look at if we order the return of the child back to Mexico. What steps will Jose take that would ameliorate the risk, the grave risk of harm to the child? We weren't able to establish anything. Again, they should have let some information come in so the court could have looked at that and made a determination about whether or not Jose was able to care for this child on a return back. Counsel, I have a question. When the appellant failed on a 13B affirmative defense, they filed a motion for reconsideration. Prior to that, when you proceeded, the court ruled against you on Article 12 and Article 20. Did you file a motion for reconsideration once the court had ruled against you on Article 12 and Article 20? No, we did not. Why didn't you file a motion for reconsideration? We thought that the best chance for an article... Those two articles are difficult articles to prove. And in the facts that we had in our case and that we were able to get in, we felt that the best way to go forward was to focus in on the grave risk of harm based on the relationship between Jose and Rocio and the risk that that posed to the child. And based on the review of the case law, we thought that that would be the best. I think that article... I might get this wrong, but one of them is a public policy argument, whether or not it's against public policy to return the child back. And that's a very... We put it in there to try to argue for it, but it's very hard to argue that. And it's hard to find cases or anything directing anything towards that. And I'm trying to remember, I think the other one may have been... We might've been arguing well settled, I think, on the other one. Well settled under the convention applies when the petitioner, in this case, Jose, waits more than 12 months to file his petition. If Jose were to wait 12 months to file, the court could then look at whether or not the minor child was well settled in the current jurisdiction in Illinois as a... I don't wanna say a determinative factor, but a main factor. There's case law that suggests that the well settled issue can be examined as a factor, not a determining factor, but an underlying factor as to whether or not the child should be returned back to the original state. We lost on those two points. And again, our analysis at the time said, well, he did file before 12 months and we didn't... And the judge was not... She was keeping us on a pretty tight leash in terms of the questions we'd be able to ask. So we decided not to pursue those two motions to reconsider. All right. And so the reason I'm asking this is because you raised the issue about undertakings. Now, doesn't undertakings go more towards establishing the habitual residence than whether or not under 13B affirmative defense about domestic violence? Well, what will happen is the cases will analyze the 13B defense having to do with domestic violence. And a more modern trend is for the cases to say, in the cases of domestic violence directed towards either the mother, who's usually the victim or the child or both, the trend is to find that undertakings are almost impossible to impose, that it's almost impossible for a court here to order any kind of an undertaking that would be effective back in the home jurisdiction. Some of the undertakings that can be ordered would be, I think in one case, a father was given the right of return provided that he was able to put up the mother and child in a hotel. And I think he promised he'd do three months in a hotel for them in a one-star hotel. This was a French case. Other undertakings are that there would be, state services would be made available to the returning mother and child to try to help them return, that they would find support from state agencies, financial. And again, I think this was the French case. How does that go towards the affirmative defense of there's domestic violence or domestic abuse? It's difficult to find undertakings that could be made. And a lot of the cases will say, we don't find that there are undertakings that can be imposed. In this case, Rocio, if she were sent back to Mexico, she would be sent back, her family is not all in Mexico and they're not back and forth, especially given the pandemic and the way that the border has been treated since she's come back. It's become very hard for people to move back and forth. Most of her family is here in Chicago. There are a couple of people who are still back in Guadalajara. And that is one of the problems is, okay, if the child is sent back to Guadalajara and there's no guarantee that Rocio would be able to go back, what would Jose do when he got there? We don't know, because there was no evidence that he has any ability to care for this child. And the evidence that did go into the record shows that he was involved on and coercive. So in terms of the question you're asking about what kind of undertakings could the court impose, I don't believe in a case like that there could be any, because there's no guarantee that Jose would respect this court's undertakings and American court's undertakings sent to Mexico. And we don't have any evidence about whether or not the Mexican courts would recognize that. And there are situations where foreign courts have said, well, we don't really recognize, or we're not going to enforce the U.S. court's undertakings in this case. And again, I can't say that for sure in this case, I don't know. There is no underlying petition right now in Mexico. Jose did not file anything. I'm not sure exactly how he got the Hague petition started, but I don't believe he started it with a petition for custody in Mexican civil court. So again, I don't know that there are any undertakings. I don't think we would find any appropriate ones, even if we had been able to ask those questions at trial. One of the, sorry, lost my thought there. So the creation of the intolerable situation is what we're concerned with. And that goes to what happens if the minor is sent back to Mexico. And one of the problems or one of the main facts that we had established during trial was Jose's both Rocio and towards the minor child. He stated when he was questioned, I asked him, would you charge Rocio with kidnapping if she came back to Mexico? And he said, yes, I would. Now that, when he had a minute to think about it, and his counsel questioned him after that, he took it back. But that's a pretty important thing for him to say. The reason that that's believable by him saying that he would have her charged is that he said similar or made similar threats to other family members and to Rocio. He said to two other family members, when she comes back, I can't wait for her to get back to Mexico because I'm going to take her daughter away from her. And he said that to, I think, to the uncle Jose and to aunt Lourdes Maria. Those are, I mean, that's a, if you're trying to determine whether or not he's going to do something to remove the child from her mother, that's pretty good evidence. And that's pretty, I think it gets into very clear and convincing. So we have that risk or that threat by him. We also have a very contentious relationship. And as I said before, it's an issue of coercive control. That's how he was controlling her. The incident having to do with her working, that was an important, it's important to remember what he said when he was questioned about her, what he told, what he was over her to say. She started working to try to make some money. And her testimony before that was, is that she had no money and he wouldn't give her money. And he wouldn't let her work. She stated that she sold shoes and perfume on the street to try to make some money. She was able to get this job at a local kindergarten teaching English. After three, and the best part of the deal was, is that she would be able to bring the minor child with her to the school. But he made her quit within two days. And his response was, it's not your duty, in essence, as a woman to work. Your duty is at home taking care of the child. And he said, if you continue with this, you will suffer consequences or there will be consequences. Those are, that's a repeated pattern of threats towards her. And again, getting back to the question of undertakings, how could she possibly be protected from that if she has to move back to Guadalajara and he's there, not that far away from her. So I think that gets to what Judge True saw as being undertakings, I'm sorry, as being the intolerable situation. And again, grave risk of harm, it exists. And although the risk of physical at this point is not, we don't have evidence of physical and we weren't able to go into certain parts of evidence. We do have the psychological. Again, the minor is six now. And at the time of the incidents we're talking about, she was three or so. So she wouldn't be able to testify about what she experienced or how she feels about her father, how she feels about these circumstances. So, but there would be, I mean, the removal of her mother, if her mother were arrested and charged with a crime, or if there were proceedings to, again, I have in the brief, a citation to the civil code of Mexico stating that a parent who abducts a child will have their parental rights terminated. Now that, again, there would have to be a proceeding to do that, but that would be the threat that she would be undergoing and that he has said that he will use against her if she returns. So in getting towards the risk of, getting towards the risk that the child faces, the child's, the risk, I think the cases are clear that the risk can be directly to the child through the mother, even though there's no direct threat to the child. I don't know if I, I hope that wasn't too much of an answer. What about counsel's argument that the cases that you cite to support that there was sufficient domestic violence here, I actually, are cases where there's a series of acts, either psychological or physical against the victim. And where in this case, they're arguing that it was just one or maybe two incidences. The cases that, yeah, the cases that you, that are usually make it to the appellate level in the federal system are going, are the worst cases. And I would think that the more workaday cases that we're dealing with. And again, one of the things you notice from the case law is there is no Illinois case law on this. And it's very hard to find any state case law on these types of cases. When you, when I researched, I was curious, like, why are there no state cases? You'll find in the practice manuals is a recommendation to bring these cases in federal court, because the federal courts are more attuned to dealing with questions of treaties and international relationships. And they won't be like a state court judge dealing with family law. And in my opinion, in our particular case, the best person to make this determination is a family court judge who deals with this type of an issue thousands of times a year and deals with maybe thousands of witnesses determining credibility and risk that that person might pose to a child or to another person. So what we get in the federal cases is the worst of the worst. And you also get a lot of litigants who have the money to be able to litigate at that level and gather the evidence. Our client doesn't have that. And we weren't able to hire investigators in Mexico or psychological experts. And again, I know that that's just our case is what our case is. But answer to the question of why don't we have more violence? I think that that would be putting a different standard on it that isn't necessarily required by the treaty. The treaty itself doesn't have a definition of grave risk. And I think that in a sense, that's helpful in one way in that it allows the courts to figure that out. And I think it also allows the courts to figure out whether or not that grave risks exists, even when it's not as terrible as those other cases are. In this case, Judge True knew what we had been arguing a lot about these cases and the law and the underlying principles with her. So when she made her decision to find grave risk existed, she understood how high the standard was and all these other cases. The cases that you find when you research this, there aren't thousands of them. There's probably less than 70 cases dealing with this question of grave risk of harm in the federal courts. But I think that unfortunately, that's not the total number of these cases that we get. I think the cases with a lesser amount may not get all the way to the federal courts. Any other questions, colleagues? No, thank you, Justice. Thank you so much, Mr. Kolodarchy. Mr. Whitfield, you have three minutes for rebuttal. I would just, there's a lot of things here. First of all, there is plenty of case law in Illinois at the federal level. Vandesad, Fabri, Hernandez v. Cardoza, Kahn v. Fatima, Nornand v. Fuentes, Guerra, Haberzink, all of these cases are in the briefs. So that is a misstatement of fact. Second, the statement that they established a bunch of other incidents of the record per, and again, most of the rulings were due to Ms. Montes' own testimony. Look at the procedure of the case, directed findings, judgments on the pleadings. This is because of what she testified to. She testified that there were only two instances of domestic abuse. Once in March, or excuse me, January of 2016, which is the yelling at the festival, and at the trial court level in her pleading, she said that she had multiple witnesses, yet none materialized in court. And I provided the video link up, and anyone, and I, it's on the record, anyone could use that. So all they had to do is send a link and anybody could have testified. They did not. Secondly, the only other instance was March, April, 2017. And again, there was an affidavit provided by a family member. Interestingly, it omits the critical and essential element to this. The child was not present. She does not corroborate the fact that the child was present or being held by Ms. Montes. There was a lot of speculation, and there was something stated by counsel that's an anthem to the convention. He questioned the legitimacy of Mexican courts, and that is not allowed under the convention. The United States is a signatory. Mexico is a signatory. We mutually respect the viability and ability of our respective courts to litigate domestic relations issues under the best interest of the child's standard. Nothing was put into evidence to suggest otherwise, and for counsel to suggest that to this body, I find troubling, and it's contravening to the expressed purpose of the convention. There were no citations in his brief, answer brief, to a modern trend. There were secondary sources written by advocates, which I can appreciate, but they're not binding on this court, and to suggest that this 40-year-old treaty is just now understanding domestic violence is another misstatement of the universe of the case law. The convention was started in 1980. As early as 86, and all through the 90s, the large body of case law has to do with grave risk and domestic violence, and it's very clear. It states that it has to be a sustained pattern of abuse, and that the child also must be in harm's way. There has to be a materialization of a high probability that harm will occur. There was no testimony that Mr. Toscano ever struck his child or ever was a danger to his child. All of these underlying aspects to who has a better job or a better house or better family members, those are all custody determinations, which are inappropriate in the Hague case. Your time has expired. Your time has expired. Please wrap up. Thank you, Your Honor. I will wrap up. Again, the purpose of the convention is to ensure that that the pre-removal status quo is maintained and that we deter domestic abductors. That's the purpose. Allowing the grave risk exception to become so broad and such a low standard would eviscerate the purpose of the convention. All of the case law speaks to this very important policy point, and that is why the standard is set so high. That is why it asks for a sustained pattern of abuse. I rest, Your Honor. Thank you. Thank you. Thank you, counsel. The matter will be taken under consideration and advisement, and this court is adjourned. Thank you all. Have a good day.